UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   SEP 04 2012   ★

LONG ISLAND OFFICE

-------------------------------------------------------------x
JONATHAN K. SMITH, a member of the
Shinnecock Indian Nation,

                           Plaintiff,

        - against -

VINCENT FREDRICO, in his individual and
official capacity as Patrol Officer, Suffolk County
Police Department,
ROBERT TROTTA, in his individual and official
capacity as Detective, Suffolk County Police
Department, and
JOHN DOES 1-10,

                      Defendants.
-------------------------------------------------------------x

**VERIFIED COMPLAINT**

Case No.: **CV.-12 4408**

Hon.   **SPATT, J.**

**BROWN, M. J.**

**SUMMONS ISSUED**

      NOW COMES Jonathan K. Smith, a member of the Shinnecock Indian Nation, the

plaintiff in the above referenced action, as and for his complaint, states as follows:

### NATURE OF THE ACTION

      1.    This is an action seeking damages, and declaratory and injunctive relief, for

various state and federal statute, treaty, and civil rights violations, brought by the plaintiff,

Jonathan K. Smith, an on-reservation member of the Shinnecock Indian Nation ("the Shinnecock

Nation"), Medicine Man, and businessman. Defendants are Vincent Fredrico, in his individual

and official capacity as patrol officer with the Suffolk County Police Department, and Robert

Trotta, in his individual and official capacity as Detective with the Suffolk County Police

Department, and John Does 1-10, identities unknown.

2.      Plaintiff does business as Shinnecock Smoke Shop and Shinnecock Trucking Co. on the Shinnecock Indian Reservation ("the Shinnecock Reservation"). At approximately 8:30 a.m. on Saturday, July 21, 2012, while driving East on I-495 toward the Shinnecock Reservation at or near Hauppauge, Suffolk County, Smith was transporting through New York State to the Shinnecock Reservation a legitimate and documented load of cigarettes purchased by Shinnecock Smoke Shop from Palmetto Wholesale Tobacco Distributors in South Carolina. South Carolina and North Carolina taxes were paid by the distributor of the cigarette products, and those states do not affix a tax stamp. Smith was targeted and stopped by the defendants for allegedly "swerving all over the place," which he denied. Warrantless searches commenced over objections, and cash and the cigarette load were seized. The transport documents were returned to Smith with the comment it "looks legitimate." No arrest was made or ticket issued. No allegation was made by the defendants of any legal violations, and no itemized list of seized property was provided.

### THE PARTIES

3.      Plaintiff, Jonathan K. Smith, ("plaintiff" or "Smith"), is a Medicine Man and member of the Shinnecock Nation, a federally recognized Tribe, and among other Tribal pursuits, conducts business as Shinnecock Smoke Shop, and Shinnecock Trucking Co., at Old Point Road, on the Shinnecock Reservation, located within the territorial boundaries of the Town of Southampton, County of Suffolk, and State of New York.

4.      Defendant, Vincent Fredrico, ("Ofc Fredrico"), is an individual employed as a patrol officer with the Suffolk County Police Department, ("SCPD"), located within the County of Suffolk, at John L. Barry Police Headquarters, 30 Yaphank Avenue, Yaphank, New York, 11980.

2

5.      Defendant, Robert Trotta, ("Det. Trotta"), is an individual employed as a detective with the SCPD, located within the County of Suffolk, at John L. Barry Police Headquarters, 30 Yaphank Avenue, Yaphank, New York, 11980.

6.      Defendants, John Does, 1-10, are individuals, identities unknown, who participated in the search and seizures described herein.

### JURISDICTION AND VENUE

7.      This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

8.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2).

### FACTUAL BACKGROUND

**Medicine Man**

9.      Smith is a Medicine Man and member of the Shinnecock Nation, a federally recognized Tribe.[1] Smith's traditional spiritual activities as a Medicine Man are self-funded from Smith's Tribal business pursuits, and are used, *inter alia,* to:

      a.  Purchase materials for prayer ceremonies in the Sweat Lodge, including coverings, wood, and food;

      b.  Purchase materials for prayer flags;

      c.  Purchase medicines not easily obtainable in the wild, including travel to other Indian reservations;

      d.  Purchase food for Indians who come to his home seeking help;

      e.  Fund the annual Labor Day Weekend Shinnecock Nation Powwow;

      f.  Fund the Shinnecock Indian Youth Council;

      g.  Fund the Shinnecock Presbyterian Church;

---

[1] *See*, Tribal Membership Verification Letter, annexed hereto as Exhibit A.

     h.   Fund World Peace and Prayer Day, Wounded Knee Memorial Ride, and other spiritual activities of spiritual leader, Chief Arvol Looking Horse, of the Sioux Nation, Sioux Cheyenne River Reservation. Chief Looking Horse, at the age of 12 was chosen to represent the 19th generation of Lakota as Keeper of the White Buffalo Calf Pipe. Chief Looking Horse was honored at the United Nations in New York, on October 18, 2006, for establishing World Peace and Prayer Day, which is held annually on the Summer Solstice, June 21, around the world.

     i.   Fund annual Sun Dance spiritual ceremonies at the Standing Rock Reservation, Cheyenne River Reservation, and Yankton Sioux Lake Andes Reservation.

10.   Smith's spiritual activities are, in part, directed at helping Shinnecock and other Indian peoples heal and overcome the personal and spiritual difficulties which have and continue to afflict them due to being victimized on their aborigine homeland over the last 400 years.[2] For example, after the U.S. Indian Wars ended and Indian matters were transferred from the War Department to the Department of Interior, U.S. Indian Policy[3] involved an admitted, and well documented, systematic state sponsored elimination of Indians as a group through forced removal and "assimilation" of Indian children.[4] Indian children between the ages of 5 and 18,[5] were removed from their families on reservations across the United States, and sent to on and off-reservation "boarding" and "day" schools,[6] with a mandated curriculum where Native language,[7] spiritual practices,[8] diet,[9] and dress,[10] were forbidden. Authorized enforcement

---

[2] *See e.g.,* the 2009 Congressional acknowledgement and apology found in Apology to Native Peoples of the United States, 123 Stat. 3453, annexed hereto as Exhibit B.
[3] *See, e.g.,* "Rules for Indian Schools, with Course of Study, List of Text-Books, and Civil Service Rules," Office of Indian Affairs, Washington: Government Printing Office, 1892, annexed hereto as Exhibit C.
[4] Rule 1, *Id.*
[5] Rule 21, *Id.*
[6] Rule 22, *Id.*
[7] Rule 93, *Id.*
[8] Rule 90, *Id.*

against the children was by corporal punishment,[11] imprisonment,[12] and being sent to non-Indian "reform schools."[13] The children were permitted only to have Indian visitors who were assimilated.[14] The removal of Indian children from their families was coerced by authorized withholding of money to the family, which presented parents with a choice of releasing their children or destituting the family.[15] In the event of a family's refusal or opposition to removal of children, the Indian Office was authorized to determine further punishment, penalties, or other action, at its discretion.[16] Once in a school, children could not be freely removed by their parents.[17] This policy of forced assimilation also included Indian day schools.[18]

11.      The U.S. implementation of this policy, and the Indian resistance and suffering, is well documented. For example, in the same year as the rules cited, 1892, the Sioux are documented to have resisted the forced assimilation and of their children being removed from their families:

> The work of the past can not be said to have been successful, and even at best civilization is slow. Surely what required twenty centuries to do is slow, compared with what our people and Government wish to do in little more than one century.[19]
> …
> It seems desirable that Indian children taken from their homes to the distant institutions should remain there for a series of years without return to their parents.[20]

---

[9] Rule 108, *Id.*
[10] Rule 109, *Id.*
[11] Rule 115, *Id.*
[12] Rule 116, *Id.*
[13] Rule 118, *Id.*
[14] Rule 15, *Id.*
[15] Rule 23, *Id.*
[16] Rule 18, *Id.*
[17] Rule 28, *Id.*
[18] Rule 2, *Id.*
[19] "Annual Report of the Commissioner of Indian Affairs, 1892," p. 431, Office of Indian Affairs, Washington: Government Printing Office, 1892, excerpt annexed hereto as Exhibit D.
[20] *Id*, p. 615, excerpt annexed hereto as Exhibit E.

12.    Since 1948, forced removal of children from a group, such as this done for generations in the U.S., constitutes an international criminal act of genocide.[21] To date, the U.S. has failed to enact any domestic laws prohibiting genocide. In 2009, the Jewish Museum Vienna, Palais Eskeles, at 1010 Vienna, Dorotheergasse 11, Austria, (www.jmw.at),  had one room devoted to photographs and objects documenting the Indian experience in the U.S., in comparison with the Jewish Holocaust experience in Europe.

### *The Fort Albany Treaty, 1664*

13.    A seizure under color of imposition of a New York State tax law violates the free trade provision of Appended Article 3, of *The Fort Albany Treaty, 1664*, ("Articles between Col.

---

[21] The U.S. 1892 Rules for Indian Schools documents and meets the definition of the international crime of genocide, which includes the act of forced removal of children from a group. See, Art. II(e) of the 1948 U.N. Convention on the Prevention and Punishment of the Crime of Genocide ("CPPCG"). U.N.T.S. No. 1021, annexed hereto as Exhibit F.

Article I, provides:

The Contracting Parties confirm that genocide, whether committed in time of peace or in time of war, is a crime under international law which they undertake to prevent and punish.

Article II, provides:

In the present Convention, genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, such as:

- (a)  Killing members of the group;
- (b)  Causing serious bodily or mental harm to members of the group;
- (c)  Deliberately inflicting on the groups conditions of life, calculated to bring about its physical destruction in whole or in part;
- (d)  Imposing measures intended to prevent births within the group;
- (e)  Forcibly transferring children of the group to another group.

Article III, provides:

The following acts shall be punishable:

- (a)  Genocide;
- (b)  Conspiracy to commit genocide;
- (c)  Direct and public incitement to commit genocide;
- (d)  Attempt to commit genocide;
- (e)  Complicity in genocide.

Cartwright and the New York Indians," *Documents Relative to the Colonial History of the State of New York*, III, pp. 67-68) ("the Treaty").[22] Appended Article 3 to the Treaty provides:

> That they may have *free trade*, as formerly.  [emphasis added]

Any tax, or other restriction or payment, on Shinnecock property in trade is contrary to this free trade provision, as the Indians would have understood the provision at the time of execution of the Treaty. "The Indians would have understood the term "free trade" to mean free from restrictions or payments in any form."[23]

### U.N. Declaration on the Rights of Indigenous Peoples

14.     The Declaration on the Rights of Indigenous Peoples, adopted by the United Nations General Assembly on September 13, 2007, ("the Declaration"),[24] provides an international law backdrop to obligations of the United States towards aborigines, such as Smith, including but not limited to, honoring treaties and protecting traditional religious practices.[25]

15.     Article 1 of the Declaration, provides "Indigenous peoples have the right to the full enjoyment, as a collective or as individuals, of all human rights and fundamental freedoms as recognized in the Charter of the United Nations, the Universal Declaration of Human Rights and international human rights law."

16.     Article 12(1) of the Declaration, provides "Indigenous peoples have the right to manifest, practice, develop and teach their spiritual and religious traditions, customs and ceremonies; the right to maintain, protect, and have access in privacy to their religious and

---

[22] *See, The Fort Albany Treaty, 1664*, annexed hereto as Exhibit G.

[23] *See,* ¶ 16 of the Declaration of Dr. John A. Strong, annexed hereto as Exhibit H.

[24] *See,* United Nations Declaration on the Rights of Indigenous Peoples, annexed hereto as Exhibit I. The Declaration is not a treaty, and requires voluntary implementation and compliance by U.N. member states, overseen by the U.N. Office of the High Commissioner for Human Rights.

[25] At adoption in 2007, the U.S. was one of only four countries to originally vote against the Declaration, along with Australia, Canada, and New Zealand, all former colonies of Great Britain with large aborigine populations. The U.S. later changed its position, and the U.S. Department of State publically announced support of the Declaration on December 16, 2010.

cultural sites; the right to use and control of the ceremonial objects; and the right to the repatriation of their human remains."

17.    Article 37 of the Declaration, provides "Indigenous peoples have the right to the recognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors and to have States honour and respect such treaties, agreements and other constructive arrangements."

**The targeted Shinnecock stop**

18.    At approximately 8:30 a.m. on Saturday, July 21, 2012, on behalf of his sole proprietorship, Shinnecock Trucking Co., Smith was driving a 16' Budget rental truck, with U.S. Department of Transportation registration number USDOT 1092543 affixed to the vehicle, East-bound on I-495 at or near Hauppauge, New York. This location is near the 4th Precinct of the SCPD, and approximately 45 miles from the Shinnecock Indian Reservation. Isaac Rashad, ("Rachad"), who is black, was the sole passenger. Both had a suitcase in the truck cab. Smith was near the end of a commercial delivery transporting a legitimate and documented load of cigarettes destined for the Shinnecock Indian Reservation, purchased by and belonging to, his sole proprietorship, Shinnecock Smoke Shop, from Palmetto Wholesale Tobacco Distributors LLC in Charleston, South Carolina.

19.    Smith was pulled over by Ofc Fredrico and another unknown Suffolk County patrol officer in a marked patrol car. Ofc Fredrico asked if Smith "was alright", and Ofc Fredrico claimed that he "had received reports of the vehicle swerving all over the road". Smith denied he was swerving. Later, when Ofc Fredrico was questioned by Rashad about the reason for the stop, Ofc Fredrico recanted this assertion and said that actually, Det. Trotta had earlier "called" him "to help with the stop." This indicates the stop was planned and targeted ahead, and Ofc.

Fredrico's stated reason to Smith for the stop was intentionally fictitious. Smith and Rachad objected to each of the ensuing searches and seizures.

**The false arrest**

20.    Det. Trotta exited from an unmarked vehicle, came up to Smith's drivers door, physically grabbed Smith by the arm, grabbed Smith's cell phone out of his hand, and pulled Smith from the vehicle. Det. Trotta said to Smith "OK, out of there. You're running cigarettes." Smith told Det. Trotta there was nothing illegal in the truck.

**The warrantless search of the vehicle's cab**

21.    Det. Trotta stated he "was going to search the truck." Det. Trotta did not have a search warrant. Smith objected, saying "I do not give my permission for you to search the vehicle." Det. Trotta's response to Smith's objection was, "I don't give a fuck." Smith objected again, going over and saying to Ofc. Fredrico "I want you to know, you do not have my permission to search the vehicle." Ofc. Fredrico's response to Smith's objection was to shrug his shoulders.

22.    The truck cargo door was locked with a Master key lock. Det. Trotta said he was going to search for the key. Smith and Rashad objected.

**The warrantless search of Smith's person**

23.    Ofc. Fredrico started to pat down Smith, and Smith pulled out his wallet, and pulled out his pockets to show they were empty.

**The warrantless search of Smith's suitcase**

24.    Det. Trotta opened and searched Smith's suitcase, and removed nothing.

**The warrantless search of Rashad's suitcase and seizure of $200 from Rashad's wallet**

25.     Over Rashad's objection, Det. Trotta removed and opened Rashad's suitcase.

Det. Trotta searched Rashad's suitcase, and removed Rashad's wallet from the suitcase, removed

$200 from Rachad's wallet, and kept the money without providing any receipt.

**The warrantless search of Smith's bank bag and seizure of Smith's shipping documents, approximately $34,623 in cash, and key**

26.     Inside Rashad's suitcase, Det. Trotta removed Smith's bank bag, and searched it.

Det. Trotta removed Smith's shipping documents, approximately $34,623 in cash, and a key

from the bank bag. The bag contained Shinnecock Smoke Shop cash and the Shinnecock Smoke

Shop and Shinnecock Trucking Co. transportation documents, invoices, the bill of lading, and

the South Carolina and North Carolina wholesale tobacco licenses for the seller, Palmetto

Wholesale Tobacco Distributors LLC. South and North Carolina do not affix tax stamps on

cigarette products after taxes are paid are paid by distributors. Det. Trotta later removed these

items from the bag at the 4th Precinct; kept the cash and returned the transportation documents.

**The warrantless search of Smith's locked cargo area and seizure of cigarettes**

27.     Det. Trotta used the key removed from Smith's bank bag, unlocked the locked

cargo area of the truck, and removed and opened a carton of cigarettes, and stated "I thought you

said there was nothing illegal inside" pointing to cigarettes which did not contain a tax stamp.

Smith pointed out that taxes were paid to North Carolina and South Carolina, and those states do

not use tax stamps.

28.     Det. Trotta said "we can do this two ways; I arrest you now or we make an

appointment." Smith replied "[l]et's make an appointment." John Doe #1 drove the truck to the

defendants' 4th Precinct. Det. Trotta drove Smith. Ofc. Fredrico drove Rashad. It was during this

drive that Ofc. Fredrico recanted the fiction for the stop to Rashad.

10

29.     At the 4th Precinct, Smith explained the Shinnecock shipping documents showed the cigarettes were a Shinnecock transaction, that taxes were paid to North Carolina and South Carolina, which do not use a tax stamp, and the cigarettes were only enroute through New York State to the destination of the Shinnecock Indian Reservation. Det. Trotta said he "had never seen this before" and "everything looked legitimate." Det. Trotta handed Smith's shipping documents back to him. Det. Trotta said he "would need to talk Monday to the Suffolk County District Attorney's Office and let them decide what to do."

30.     Smith produced and showed his Shinnecock Indian Identification card issued by the United States Bureau of Indian Affairs, Department of the Interior, to Det. Trotta, and in response, Det. Trotta stated "Oh yea, you guys are federal now. I hear the State is out to screw you guys on that casino deal."

31.     Det. Trotta read *Miranda* rights to Smith. Det. Trotta wrote out a statement for Smith and instructed him to sign it.

32.     Over their objections, Det. Trotta instructed Smith and Rashad to pose for digital pictures while holding a package of cigarettes in front of the truck.

33.     Without completely counting the property he seized, Det. Trotta ambiguously described the property as "aprox $34,623 in cash" and "aprox 2,100 cartons of cigarettes Various Brands", according to a document titled "General Receipt" he gave to Smith.[26] The Receipt refers to 'finders" and appears to be a lost and found receipt for items the public turns into the police department.

34.     Det. Trotta wrote a SCPD central complaint number on the Receipt, "CC# 12-452672". Upon information and belief, because of the high number of digits after the year, this is not a true central complaint number, but fictitious.

---

[26] Annexed hereto as Exhibit J.

35.     No receipt was given to Rashad for the $200 seized from his wallet by Det.

Trotta.

36.     No arrest was made and no tickets were issued. No allegation was made of any

New York law violation.

37.     John Does, 1-10, identities unknown, assisted in the planning and execution of

the search and seizure and the processing of Smith's property.

38.     Det. Trotta, Ofc. Fredrico, and John Does 1-10, did conspire together prior to

the stop to deprive Smith of his property, and to deprive Smith of his right to be free of

unreasonable search and seizures, and of the equal protection of the laws, on the basis of his

racial identity as a Shinnecock Indian.

39.     As of the present date, the defendants have not returned the seized Shinnecock

property, or made any allegation of any legal violation.

## CAUSES OF ACTION

### Count I
### (Robert Trotta, Vincent Fredrico, and John Does 1-10)
### Exemption under New York Tax Law, Art. 20, §481(2)(b)

40.     Smith realleges each and every prior allegation as if fully and completely

repeated herein.

41.     Inasmuch as Det. Trotta, Ofc. Fredrico, and John Does 1-10 sought to enforce

New York Tax Law Art. 20, §471 against Smith, which imposes an excise tax on cigarettes and

other tobacco products, §481(2)(b) provides an exemption for common or contract carriers if

they are "engaged in lawfully transporting ... unstamped packages of cigarettes as merchandise."

12

42.     Smith, in transporting the subject cigarettes from out of and through New York State to the Shinnecock Indian Reservation at the time of the stop, Smith was exempted under §481(2)(b) from application of Art. 20, §471.

### Count II
### (Robert Trotta, Vincent Fredrico, and John Does 1-10)
### Preemption under federal law, 49 U.S.C. § 14501(c)(1)

43.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

44.     Inasmuch as Det. Trotta, Ofc. Fredrico, and John Does 1-10 sought to enforce New York PHL 1399-ll(1), (2) against Smith, said provisions are invalid and unenforceable as preempted by federal law, 49 U.S.C. § 14501(c)(1) , which provides that "[A] State … may not enact or enforce a law related to a price, route, or service of any motor carrier … with respect to the transportation of property."

### Count III
### (Robert Trotta, Vincent Fredrico, and John Does 1-10)
### Violation of the Indian Religious Freedom Act of 1978

45.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

46.     Inasmuch as Robert Trotta, Vincent Fredrico, and John Does 1-10 sought to impose a New York State tax upon Smith's property, or otherwise seized Smith's property under color of New York State law, said defendants violated the Indian Religious Freedom Act of 1978, 42 U.S.C. § 1996, ("IRFA"), by seizing assets of Smith which fund in part Smith's federally protected exercise of his traditional religious activities.

47.     Robert Trotta, Vincent Fredrico, and John Does 1-10  not only failed the stated policy of the United States under IRFA to "protect and preserve for American Indians their

13

inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites," but the seizure of Smith's assets destroys Smith's ability to exercise traditional religious activities.

### Count IV
### (Robert Trotta)
### Civil rights action for deprivation of civil rights, 42 U.S.C. § 1983

48.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

49.     The grabbing of Smith's arm and forced removal from the vehicle by Det. Trotta without an arrest warrant was a violation of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

### Count V
### (Robert Trotta)
### Civil rights action for deprivation of civil rights, 42 U.S.C. § 1983

50.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

51.     The removal and search of Smith's suitcase from Smith's vehicle by Det. Trotta without a search warrant was a violation of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

### Count VI
### (Robert Trotta)
### Civil rights action for deprivation of civil rights, 42 U.S.C. § 1983

52.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

14

53.     The search of Smith's bank bag by Det. Trotta without a search warrant was a violation of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

### Count VII
### (Robert Trotta)
### Civil rights action for deprivation of civil rights, 42 U.S.C. § 1983

54.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

55.     The search of the locked cargo area of Smith's vehicle by Det. Trotta without a search warrant was a violation of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

### Count VIII
### (Robert Trotta, Vincent Fredrico, and John Does 1-10)
### Violation of the Fort Albany Treaty, 1664

56.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

57.     Inasmuch as Det. Trotta, Ofc. Fredrico, and John Does 1-10 sought to impose and enforce a New York State tax upon Smith's property as part of trade destined for the Shinnecock Indian Reservation, said defendants were without and in excess of jurisdiction.

58.     The aforementioned conduct is in violation of the treaty guarantee of free trade under the terms of Appended Article 3, of *The Fort Albany Treaty, 1664*, because a tax on Indian property in trade is contrary to the free trade provision, as the Indians would have understood the provision at the time of execution of the Treaty.

15

### Count IX
### *(Robert Trotta, Vincent Fredrico, and John Does 1-10)*
### *Civil rights action for deprivation of property rights, 42 U.S.C. § 1982*

59.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

60.     42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

61.     The defendants' interference with, and search and seizure of, Smith's personal property, on the basis of his membership in a Shinnecock Indian class of persons, violates Smith's right to purchase, hold, sell and convey his personal property in violation of 42 U.S.C. § 1982.

62.     Smith's exercise of his Shinnecock aboriginal trading rights under the Free Trade Clause, Appended Article 3, of the Fort Albany Treaty, 1664, are property rights within the meaning of 42 U.S.C. § 1982, and the interference and deprivation of said rights by the defendants violates 42 U.S.C. § 1982.

### Count X
### *(Robert Trotta, Vincent Fredrico, and John Does 1-10)*
### *Civil rights action for conspiracy to interfere with civil rights, 42 U.S.C. § 1985*

63.     Smith realleges each and every prior allegation as if fully and completely repeated herein.

64.     Det. Trotta, Ofc. Fredrico, and John Does 1-10 did, in violation of 42 U.S.C. § 1985(3), conspire with another for the purpose of depriving, either directly or indirectly, Smith as a member of the Shinnecock Indian class of persons, of the equal protection of the laws, and of equal privileges and immunities under the laws.

16

### Count XI
### (Robert Trotta, Vincent Fredrico, and John Does 1-10)
### Civil rights action for neglect to prevent, 42 U.S.C. § 1986

65.     Smith realleges each and every prior allegation as if fully and completely repeated
herein.

66.     Det. Trotta, Ofc. Fredrico, and John Does 1-10, did, in violation of 42 U.S.C. §
1986, with knowledge of the wrongs conspired to be done at the request and instruction of Det.
Trotta, were about to be committed, and having power to prevent or aid in preventing the
commission of same, neglected or refused to do so, to Wit:  Neglecting or refusing to prevent,
with knowledge of a conspiracy to deprive, either directly or indirectly, Smith as a member of
the Shinnecock Indian class of persons, of the equal protection of the laws, and of equal
privileges and immunities under the laws.

### Count XII
### (Robert Trotta, Vincent Fredrico, and John Does 1-10)
### Violation of Article I, Section 8, Clause 3 of the U.S. Constitution

67.     Smith realleges each and every prior allegation as if fully and completely repeated
herein.

68.     The application and enforcement of the state tax as applied to the Shinnecock
Indian Nation and its members, is unconstitutional, and is invalid as applied.

69.     Plaintiff seeks an extension of the law, to Wit: the plain meaning and original
intent of Art. I, Sec. 8, Cl. 3 of the U.S. Constitution does not grant power to Congress to
regulate Indian Tribes, which were, and are, sovereign nations. To this end, the Supreme Court
should review and overturn the first Indian case to reach that court, *The Cherokee Nation v. The*

*State of Georgia*, 30 U.S. 1, 5 Pet. 1, 8 L.Ed. 25, 1831 WL 3974 (1831)(C.J. Marshall),[27] and

adopt the dissenting opinion of Justice Thompson.[28]

      70.     The said actions exceed Congress' power to regulate commerce "with the Indian

Tribes." Art. I, Sec. 8, Cl. 3, ("Commonly known as the "Indian Commerce Clause."), provides

in pertinent part:

---

[27] Annexed hereto as Exhibit K. In 1831, *Cherokee Nation* provided an important legal victory for the Government, which gave a critical Supreme Court stamp of approval to a "Final Consolidation" U.S. Indian Policy, coined and articulated by Thomas Jefferson in 1803, of U.S. expansion by deceptively eliminating Indians as a race and taking Indian lands by mechanisms of debt and force - what today would constitute the international crime of "genocide." See, Art. II(a) – (c), CPPCG, *supra*. In a letter, annexed hereto as Exhibit L, dated February 27, 1803, to William Henry Harrison, then Governor of Indiana Territory, President Jefferson wrote:

    …. from the *Secretary of War* you receive from time to time information and instructions as to our Indian affairs…. this letter being unofficial and private, I may with safety give you a more extensive view of *our policy respecting the Indians*…. When they withdraw themselves to the culture of a small piece of land, they will perceive how useless to them are their extensive forests, and will be willing to pare them off from time to time in exchange for necessaries for their farms and families. *To promote this disposition to exchange lands*, which they have to spare and we want, for necessaries, which we have to spare the they want, *we shall push our trading houses, and be glad to see the good and influential individuals among them run in debt, because we observe that when these debts get beyond what the individuals can pay, they become willing to lop them off by a cession of lands*…. In this way *our settlements will gradually circumscribe and approach the Indians, and they will in time either incorporate with us as citizens of the United States, or remove beyond the Mississippi.* The former is certainly *the termination of their history* most happy for themselves; but, in the whole course of this, it is essential to cultivate their love. As to their fear, we presume that *our strength and their weakness is now so visible that they must see we have only to shut our hand to crush them*, and that all our liberalities to them proceed from motives of pure humanity only. Should any tribe be foolhardy enough to take up the hatchet at any time, *the seizing the whole country of that tribe, and driving them across the Mississippi*, as the only condition of peace, would be an example to others, and a *furtherance of our final consolidation*…. [emphasis added]

    *Writings of Thomas Jefferson*, Ed. Andrew A. Lipscomb, 10:369-71; Reproduced in *Documents of United States Indian Policy*, 2nd Ed., University of Nebraska Press, Ed. Francis Paul Prucha.

[28] Justice Thompson's detailed 31 page dissenting opinion, is joined by Justice Story. *See*, 30 U.S. at 50-81. Justice Thompson wrote, summarizing his dissent:

    Upon the whole, I am of opinion,

1.    That *the Cherokees compose a foreign state within the sense and meaning of the constitution*, and constitute a competent party of (sic) maintain a suit against the state of Georgia.
2.    That the bill presents a case for judicial consideration, arising under the laws of the United States, and treaties made under their authority with the Cherokee nation, and which laws and treaties have been, and are threatened to be still further violated by the laws of the state of Georgia referred to in this opinion.
3.    That an injunction is a fit and proper writ to be issued, to prevent the further execution of such laws, and ought therefore to be awarded.

    And I am authorized by my brother Story to say, that he concurs with me in this opinion. [emphasis added]

    *Cherokee Nation,* 30 U.S. at 81.

> The Congress shall have the Power ... *To regulate Commerce* with foreign
> Nations, and among the States, and *with the Indian Tribes*; [emphasis added]

In Chief Justice Marshall's uncharacteristically brief 5 page majority opinion in *Cherokee*

*Nation*, the Supreme Court found it lacked original jurisdiction under Art. III, Sec. 2, Cl.1, to

hear a motion for a subpoena and injunction by the Cherokee Nation to restrain Georgia from

executing and enforcing its laws within Cherokee Territory, holding that the Cherokee Nation

had the status of a "domestic dependant nation" of the United States, and was not a "foreign

nation.". *Cherokee Nation,* 30 U.S. at 17. Here, under *Cherokee Nation*, Smith as a member of

the Shinnecock Nation, is a member of a "domestic dependant nation."

71.      *Cherokee Nation* provided the erroneous jurisdictional underpinning for

subsequent extension of Congress' power, pursuant to Art. I, Sec. 8, Cl. 3, to carry out the U.S.

"Final Consolidation" Indian Policy as stated in Jefferson's 1803 letter to Harrison, to the present

day, and must be reversed.[29]

72.      The legal status of Smith's membership in the Shinnecock Indian Nation as a

"domestic dependent nation" of the United States, and any assertion of tax pursuant to

Congressional power granted by Art. I, Sec. 8, Cl. 3, violates the plain meaning of Art. I, Sec. 8,

Cl. 3.[30]

---

[29] By illustration of the United States initial nearly lone vote against the Declaration in 2007, Justice Thompson's dissent in *Cherokee Nation* in 1831 is destined someday to become the basis for a majority opinion, as sure as lawful slavery and segregation by race became eliminated in the U.S. and internationally in the thrust of history. The Supreme Court has not had an opportunity to right such a historical wrong to a people since the abrogation of the holding that slaves are constitutionally protected property of citizens in *Scott v. Sandford*, 60 U.S. 393 (1856) after the Civil War by the Thirteenth and Fourteenth Amendments, and nearly one hundred years later, the repudiation of the "separate but equal" racial doctrine holding in *Plessy v. Ferguson*, 163 U.S. 537 (1896) by *Brown v. Board of Education*, 347 U.S. 483, 494-495 (1954).

[30] The Office of the High Commissioner for Human Rights, Committee on the Elimination of Racial Discrimination, has identified one factor and difficulty impeding the implementation of the CERD convention as to the United States being *"the persistence of the discriminatory effects of the legacy of slavery, segregation, and destructive policies with regard to Native Americans"* [emphasis added] (para. 384), and issued concerns and recommendations, *inter alia*, "that treaties signed by the Government and Indian tribes, described as 'domestic dependent nation' under national law, can be unilaterally terminated by Congress and the land they possess or use can be taken without compensation by a decision by the Government." (para. 400) (A/56/18, adopted on 13 August 2001), annexed

### *PRAYER FOR RELIEF*

**WHEREFORE,** Plaintiff, Jonathan K. Smith, requests the following Relief:

1.    **As to Count One (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

      a.    A Declaratory Judgment in favor of plaintiff that New York Tax Law Art. 20, §471 does not apply against plaintiff, because §481(2)(b) applies which provides an exemption for common or contract carriers.

      b.    Preliminary and permanent injunctive relief directing return of all property seized from plaintiff.

      c.    Disbursements, attorney's fees, and such further and other relief as the Court deems just and proper.

2.    **As to Count Two (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

      a.    A Declaratory Judgment in favor of plaintiff that New York PHL 1399-ll(1), (2) are invalid and unenforceable against plaintiff as preempted by federal law, 49 U.S.C. § 14501(c)(1) .

      b.    Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

      c.    Disbursements, attorney's fees, and such further and other relief as the Court deems just and proper.

3.    **As to Count Three (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

      a.    A Declaratory Judgment in favor of plaintiff that the imposition of New York State tax upon Smith's property, or otherwise the seizure of Smith's property under color

---

hereto as Exhibit M. A failure of the United States to respond triggered further U.N. action. (Early Warning and Urgent Action Procedure, Decision 1(68), adopted on 8 March 2006) The United States failed a second time to respond. (U.N. High Commissioner for Human Rights letter to United States, 18 August 2006 and 9 March 2007)

of New York State law, violated the Indian Religious Freedom Act of 1978, 42 U.S.C. § 1996,

("IRFA").

b.      Preliminary and permanent injunctive relief directing and accounting and

return of all property seized from plaintiff.

c.      Disbursements, attorney's fees, and such further and other relief as the

Court deems just and proper.

4.      **As to Count Four (Robert Trotta)**

a.      A Declaratory Judgment in favor of plaintiff that the grabbing of Smith's

arm and forced removal from the vehicle by Robert Trotta was a violation of the Fourth

Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

b.      Preliminary and permanent injunctive relief directing an accounting and

return of all property seized from plaintiff.

c.      Compensatory damages.

d.      Punitive damages.

e.      Statutory disbursements, costs, expert fees, and attorney's fees authorized

under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

5.      **As to Count Five (Robert Trotta)**

a.      A Declaratory Judgment in favor of plaintiff that the removal and search

of Smith's suitcase from Smith's vehicle by Det. Trotta without a search warrant was a violation

of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

b.      Preliminary and permanent injunctive relief directing an accounting and

return of all property seized from plaintiff.

c.      Compensatory damages.

21

d.   Punitive damages.

e.   Statutory disbursements, costs, expert fees, and attorney's fees authorized under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

6.   **As to Count Six (Robert Trotta)**

a.   A Declaratory Judgment in favor of plaintiff that the search of Smith's bank bag by Robert Trotta was a violation of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

b.   Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

c.   Compensatory damages.

d.   Punitive damages.

e.   Statutory disbursements, costs, expert fees, and attorney's fees authorized under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

7.   **As to Count Seven (Robert Trotta)**

a.   A Declaratory Judgment in favor of plaintiff that the search of the locked cargo area of Smith's vehicle by Robert Trotta was a violation of the Fourth Amendment to the federal constitution, and a violation of 42 U.S.C. § 1983.

b.   Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

c.   Compensatory damages.

d.   Punitive damages.

e.   Statutory disbursements, costs, expert fees, and attorney's fees authorized under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

8. **As to Count Eight (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

a. A Declaratory Judgment in favor of plaintiff that the imposition and enforcement of a New York State tax upon Smith's property as part of trade destined for the Shinnecock Indian Reservation, said defendants were without and in excess of jurisdiction as in violation of the treaty guarantee of free trade under the terms of Appended Article 3, of *The Fort Albany Treaty, 1664.*

b. Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

c. Disbursements, attorney's fees, and such further and other relief as the Court deems just and proper.

9. **As to Count Nine (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

a. A Declaratory Judgment in favor of plaintiff that Smith's exercise of his Shinnecock aboriginal trading rights under the Free Trade Clause, Appended Article 3, of the Fort Albany Treaty, 1664, are property rights within the meaning of 42 U.S.C. § 1982, and said defendants' interference and deprivation of Smith's property violates 42 U.S.C. § 1982.

b. Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

c. Compensatory damages.

d. Punitive damages.

e. Statutory disbursements, costs, expert fees, and attorney's fees authorized under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

23

10.     **As to Count Ten (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

      a.     A Declaratory Judgment in favor of plaintiff that Robert Trotta, Vincent Fredrico, and John Does 1-10 did, in violation of 42 U.S.C. § 1985(3), conspire with another for the purpose of depriving, either directly or indirectly, Smith, and members of the Shinnecock Indian Nation as a class of persons, of the equal protection of the laws, and of equal privileges and immunities under the laws.

      b.     Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

      c.     Compensatory damages.

      d.     Punitive damages.

      e.     Statutory disbursements, costs, expert fees, and attorney's fees authorized under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

11.     **As to Count Eleven (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

      a.     A Declaratory Judgment in favor of plaintiff that Robert Trotta, Vincent Fredrico, and John Does 1-10, did, in violation of 42 U.S.C. § 1986, with knowledge of the wrongs conspired to be done at the request and instruction of Robert Trotta, were about to be committed, and having power to prevent or aid in preventing the commission of same, neglected or refused to do so, to Wit:  Neglecting or refusing to prevent, with knowledge of a conspiracy to deprive, either directly or indirectly, Smith, and members of the Shinnecock Indian Nation as a class of persons, of the equal protection of the laws, and of equal privileges and immunities under the laws.

      b.     Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

c.     Compensatory damages.

d.     Punitive damages.

e.     Statutory disbursements, costs, expert fees, and attorney's fees authorized under 42 U.S.C. § 1988(b), and such further and other relief as the Court deems just and proper.

12.     **As to Count Twelve (Robert Trotta, Vincent Fredrico, and John Does 1-10)**

a.     A Declaratory Judgment in favor of plaintiff that the legal status of Smith's membership in the Shinnecock Indian Nation as a "domestic dependent nation" of the United States, and the regulation of the Shinnecock Indian Nation and its members, exceeds the federal constitutional grant of power that "The Congress shall have the Power … To regulate Commerce with foreign Nations, and among the States, and with the Indian Tribes" of Art. I, Sec. 8, Cl. 3.

b.     Preliminary and permanent injunctive relief directing an accounting and return of all property seized from plaintiff.

c.     Preliminary and permanent injunctive relief in favor of plaintiff enjoining application of federal and state law on Shinnecock Indian Reservation lands.

d.     Disbursements, attorney's fees, and such further and other relief as the Court deems just and proper.

/
/
/
/
/
/
/
/
/
/
/
/

Dated: New York, New York
       September 4, 2012

MOORE INTERNATIONAL LAW PLLC.

By: _____
         Scott Michael Moore, Esq. (SM7478)
        *Attorneys for Plaintiff, Jonathan K. Smith*
        45 Rockefeller Plaza, Suite 2000
        New York, New York 10111
        T. (212) 332-3474
        F. (212) 332-3475
        E. smm@milopc.com

VERIFICATION

I declare under penalty of perjury under the laws of the United States that the above statements in this Verified Complaint are true and correct.

Dated this _21_ day of August, 2012.

Jonathan K. Smith